# Richmond.

## Scruggs v. Commonwealth.

January 18, 1923.

1. Intoxicating Liquors—*Search Warrant—Admissibility of Illegal and Improper Search Warrant where no Incriminating Evidence was Found under it—Harmless Error.*—In a prosecution for violation of the prohibition act the introduction in evidence of a search warrant, where neither the warrant nor the affidavit upon which it was founded conformed to the statute, if error at all was harmless, where it appeared that, in the execution of the warrant, no incriminating evidence was found. Under these circumstances it does not appear that the accused could have been injured by the introduction of the warrant in evidence.

2. Intoxicating Liquors—*Searches and Seizures—Illegal Search Warrant—Consent of the Accused to the Search—Case at Bar.*—In the instant case, a prosecution for violation of the prohibition act, the officers who arrested accused and searched his premises had a search warrant to search a cottage on the farm of the wife of accused. A search of this cottage revealed no incriminating evidence. According to the testimony of the officers, they continued their search and found a still near this cottage, and that they then told accused that they wished to search his dwelling house and premises, and that accused consented to the search. Upon this second search incriminating evidence was found and upon the trial counsel for accused moved to strike out so much of the testimony of the officers as detailed the finding of the incriminating evidence upon the second search. This motion was made after the officers had testified that the search was made with the consent of accused, although told that the officers had no search warrant to search the dwelling house and outbuildings of accused, and before accused had denied that he consented to the search.

   *Held:* No error, as there had been no denial by accused of his consent to the search.

3. Intoxicating Liquors—*Instructions—Instruction Favorable to Accused not Ground for Reversal.*—On a trial for violation of the prohibition act the court gave an instruction upon the effect of evidence obtained by an illegal search in every way favorable to the defendant, and in accord with his theory of the law on the subject.

*Held:* That such instruction was not a just ground of exception by accused.

4. Appeal and Error—*New Trial—Verdict without Evidence to Support it or Contrary to the Evidence—Conflicting Evidence.*—In the instant case, a prosecution for violation of the prohibition act, if all the evidence which was obtained on an alleged illegal search of the premises of the accused was .excluded, there was still sufficient left to support the verdict of guilty, although if the testimony of the accused could be accepted, the verdict did him grave injustice, yet the evidence was conflicting, and in such case the verdict of the jury settled such conflict and it could not be disturbed except in very rare and·exceptional cases, of which this was not one.

5. Exceptions, Bill of—*Time of Signing by Judge—Attestation Held to Show Bills Signed within the Time Prescribed by Law.*—In the instant case the Attorney-General objected to considering any of the bills of exception on the ground that it did not affirmatively appear that they were signed within the time required by law. Each bill bore a date just below and to the left of the signature of the judge which was within the prescribed time, and beneath both was the attestation of the clerk.

*Held:* That this sufficiently showed that the bills were signed within the time prescribed by law.

Error to a judgment of the Circuit Court of Appomattox county.

*Affirmed.*

The opinion states the case.

*J. Taylor Thompson,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

Burks, J., delivered the opinion of the court.

The accused was indicted in an "omnibus count" under section 7 of the prohibition act (Laws 1918, chapter 388). There was a general verdict of guilty as charged in the indictment, and the punishment fixed

was confinement in jail for two months and the payment of a fine of $100.    No bill of particulars was called for.    The judgment followed the verdict.

The specific offense which the Commonwealth undertook to prove was the unlawful manufacture of ardent spirits.    It relied upon the testimony of the sheriff, a deputy sheriff and a justice of the peace, who executed a search warrant and arrested the accused.    The Commonwealth proved by these witnesses that the sheriff had received an anonymous letter telling him that J. T. Scruggs and his son Arthur Scruggs and his wife, were operating a still in a little cottage house on the farm owned by J. T. Scruggs' wife, and on which J. T. Scruggs and his family lived; that in pursuance of this information the sheriff made affidavit to these facts and secured from a justice of the peace a search warrant to search the cottage house aforesaid; that on August 17, 1921, the sheriff, in company with one of his deputies, and T. W. Morse, a justice of the peace, went to the premises of Scruggs to make a search for this still; that Scruggs was not at home but that they met him near his sawmill with laborers and team, and read to him the search warrant, and he went with them, at their request, to the said cottage house which was searched, but nothing was found therein except a stove and a pile of hops, and that the accused denied any knowledge of whiskey there; that no still was found there, but that the sheriff and his deputy then searched a branch near by and on this branch discovered a still set up and ready for operation, and about one hundred gallons of mash; that from the trodden down condition of the ground around the still and the ashes and refuse from the mill, from the general appearance of the still and its surroundings, it appeared to have been in operation for some time; that the still was about one-fourth

of a mile from the dwelling of Scruggs on the farm belonging to his wife, and occupied by himself and family; that on returning to Scruggs' residence he told Scruggs that he had found a still on the farm and that he wanted to search his dwelling house and outbuildings, and that Scruggs consented for him to do this; that he looked through the cracks of the outbuilding and saw some barrels and buckets and got a strong smell of mash; that Scruggs consented to the search of the outbuilding but said he did not have a key, and that thereupon the justice produced a key from his own bunch which fitted the lock; that they entered the outhouse and found two thirty-gallon barrels of mash made of corn meal, water and molasses; that there was molasses in both barrels; that the sheriff then started back to the still in company with Scruggs and the justice, but that he had forgotten where to turn off from the road, and that Scruggs pointed out the way to him, although he had not been with them to the still and had disclaimed any knowledge of the still on the premises. It is further shown for the Commonwealth that while Scruggs and the justice of the peace were alone, the justice said to him "You are not in this business by yourself, you had better tell who is helping you," and that Scruggs replied "Yes; there is another man in it who lives near Pamplin, but I am afraid to tell on him because he will kill me. I am in it now and I had better let it go at that, but I am not guilty." Both the sheriff and the justice testify that Scruggs consented to the search of his dwelling house and outbuildings, although he had been informed that they had no search warrant therefor.

On the other hand, the accused testified that when the sheriff and his deputy and the justice came to his farm the justice spoke to him, and said "Jim, we have a

paper that we want to read to you which charges you with making whiskey," and read the paper to him— the search warrant above mentioned; that he replied if there was any whiskey outfit or anything on his farm that he had no knowledge of it whatever; that he asked the officers who gave them such information and was then shown by the justice the anonymous letter, and they stated that upon the contents of that letter the sheriff had sworn out the warrant. The officers then requested him to go with them and show them the cottage house mentioned in the warrant, which he agreed to do, and upon arriving at the cottage house the officers entered the house but found no part of any whiskey apparatus. They went to a tobacco barn about fifty yards away but found no whiskey apparatus there. While the witness was returning to his dwelling house in company with the justice, the sheriff came up to them and said: "John, we have found it;" and the witness replied, "Where did you find it?" The sheriff said he found it on the farm and the witness stated that he had not been over on that corner of his wife's farm for several years; that it was a piece of heavy undergrowth and witness had no occasion to go there for any farming purpose. Thereupon the sheriff stated to the witness that he would have to search the home of the witness, to which the witness replied that the search warrant did not apply to any house except the cottage house on the river and the barn, but the sheriff stated that having found the still he had a right to search the premises. The witness denied his right, but the sheriff insisted on making the search and proceeded to do so. The sheriff went to the outhouse which is used by the witness, just across the public road from the witness' house. The door was fastened and the sheriff asked for a key. The witness did not know where the key was because some

member of his family who was absent had it.    The
sheriff then tore from the building a plank that was
nailed across the window and was in the act of entering
the house when the justice unfastened the lock and the
sheriff entered.    In this house were two kegs.    One of
these kegs or half-barrels had been used for molasses
and the molasses had been hard caked and sugared,
and the witness had knocked the head out of the barrel
in order to get the molasses out as it would not run
through the spigot.    This barrel was sitting in the out-
house and had been originally used for making hog feed
and was at this time about half full of hog feed.    It had
been used for this purpose only a week or two, and still
had the molasses in it.    The other barrel was an old
slop barrel used by witness for containing hog feed and
had been used several years, and was a vinegar barrel
with no molasses in it.    These two barrels had in them
at the time of the search a mixture of corn meal and
water and vegetables and other refuse from the kitchen
which the witness regularly used for feeding his hogs.
There was no particle of material in these barrels that
could be used for making liquor under any circum-
stances.    The witness further testified that the spot
where this still was located was closer to some other
people's houses than it was to his, and was more accessi-
ble to some other houses in the community than it was
to his house.    He stated furthermore that the only
marks of travel to the still were along a pathway which
led from the still to the ridge road and that this ridge
road led out to the public road about half a mile away
from the witness' home, and that the other road which
led from the still in the direction of the witness' home
showed no marks of travel at all; that it was an old
road that had grown up with undergrowth years ago.
He also proved by several neighbors, some of whom had

known him for upwards of twenty years, that his reputation for truth and veracity was good; that the accused never used whiskey in any way; that he was a dry man, and that they had never heard of his handling whiskey; that the location of the still was "as close or closer to other houses in the community than it was to Mr. Scruggs' house." Two of the witnesses for the accused also testified that the barrels of "mash" found in the outhouse near the house of the accused were "hog feed" composed of corn meal and water and the refuse slop from the kitchen, and that before any question was raised about it, they had fed the hogs of the accused for him out of said barrels.

[1] The first error assigned is to the action of the trial court in permitting the search warrant to be introduced in evidence by the Commonwealth, "because the search warrant on its face, considered in connection with the other evidence in the case, showed the same to be illegal and improper evidence to be admitted." The trial court was of opinion that the warrant was admissible "in so far as it applied to his right to search the cottage on the creek" and admitted it for the purpose of showing that the search of the cottage was legal, "but expressly stated to the jury that the search warrant to search the house on the creek could not be used as evidence to search the dwelling house and the outhouse near thereto which were not mentioned in the warrant." The objection to the admissibility of the warrant was because neither the warrant nor the affidavit upon which it was founded conformed to the statute in such case made and provided. The testimony was that, in the execution of the warrant, no incriminating evidence was found. Under these circumstances we do not perceive how the accused could have been injured by the introduction of the warrant in evidence. If error, it was harmless.

[2] The second and third assignments of error were to the refusal of the trial court to strike out so much of the testimony of the sheriff and justice as detailed the finding of the "mash" in the outhouse, and as to what transpired at that place. The motion in each instance appears to have been made before any testimony had been introduced by the accused, and after the witness had testified that the accused had consented to the search of the building, although the sheriff had told the accused that he had no warrant to search said building. A lengthy argument has been made, under these two assignments, upon the admissibility of the evidence obtained by an illegal search. But, in the view we take of the case, that question is not involved, as the testimony up to that time showed that the search was made with the consent of the accused. When the motions to exclude were made there had been no denial of the consent to the search.

[3] After all the evidence both for the Commonwealth and the accused had been introduced, the court, of its own motion, gave to the jury the following instruction: "The court instructs the jury that if they believe from the evidence in this case that the officers searched the house near the dwelling of Scruggs, without a legal warrant, or if they believe from the evidence that Scruggs was induced to permit the search by the statement of the officers that they had a search warrant, and that the officers did not have any warrant to search that particular house, the search was not legal and the jury cannot consider any evidence obtained in that way." To the giving of this instruction the defendant, by counsel, excepted. The instruction was in every way favorable to the defendant, and accorded with his theory of the law on the subject, and is not a just ground of exception by him. It was contended that

the court committed grave error in the admission of testimony, and that the error so committed could not be thus cured or effaced by the instruction. The instruction contains no error of which the accused can complain. His objection, if valid, went to the admissibility of the testimony, and not to the correctness of the instruction. But we have seen, in discussing the last two assignments of error, that the trial court committed no error in admitting the testimony, in the then state of the evidence in the case.

[4] The fifth and last assignment of error is to the action of the trial court in refusing to set aside the verdict as contrary to the law and evidence. If all the evidence which was obtained on the alleged illegal search were excluded, as the accused claims should be done, there is sufficient left to support the verdict. We could not say that the verdict was without evidence to support it, or was plainly contrary to the evidence. If the testimony for the accused could be accepted as facts, the verdict does him grave injustice. But we are not permitted to so accept it. The evidence was conflicting, and in such case the verdict of the jury settling such conflict cannot be disturbed except in very rare and exceptional cases of which this is not one.

[5] The Attorney-General objected to considering any of the bills of exception on the ground that it does not affirmatively appear that they were signed within the time required by law. Each bill bears a date just below and to the left of the signature of the judge which is within the prescribed time, and beneath both is the attestation of the clerk. This sufficiently shows that the bills were signed within the time prescribed by law.

There is no error in the judgment complained of, and it is affirmed.

*Affirmed.*