Present:  All the Justices

WAYNESBORO VILLAGE, L.L.C.

OPINION BY JUSTICE LEROY R. HASSELL, SR.

v.   Record No. 970343                    January 9, 1998

BMC PROPERTIES, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
Rudolph Bumgardner, III, Judge

The primary issue we consider in this appeal is whether a restrictive covenant is enforceable.

The relevant facts are not in dispute.  Shenandoah Village Associates, L.P., predecessor in title to appellant, Waynesboro Village, L.L.C., was the original developer of a retail shopping mall in Waynesboro.  By recorded deeds of trust, Shenandoah Village conveyed certain real estate, in trust, to secure an indebtedness to Dollar Dry Dock Bank.

Subsequently, BMC Properties executed an agreement with Shenandoah Village to purchase a four-acre tract of land, which was a part of the land encumbered by the deeds of trust.  After the deeds of trust were recorded, a certificate of partial release for the four-acre tract was recorded among the land records in Waynesboro.  Shenandoah Village conveyed to BMC the four-acre tract of land by a recorded deed dated 1989 which contained the following restriction on the remaining property owned by Shenandoah Village:

"The party of the first part [Shenandoah Village] covenants and agrees (i) not to sell any remaining portion of the property which it acquired from Royal Oaks Investment Corporation for use as a motel, hotel, inn or lodging business or similar facility, (ii) not to allow any remaining portion of the property which it acquired from Royal Oaks Investment Corporation to be used, constructed or improved as a motel, hotel, inn or lodging business or similar facility, and (iii) that no

such lodging facility or business shall be allowed to operate or exist within the boundaries of its remaining property. This restriction shall only apply for so long as the property herein conveyed to the party of the second part is being used as a motel, hotel, inn or lodging business or similar facility. Upon the discontinuance of such use, this restriction shall expire."

Also included in the recorded deed to BMC was the following

restriction on the use of BMC's property:
"The party of the second part [BMC] covenants and agrees that (i) no factory outlet or discount retail stores or gas station, (ii) no drive-in or fast food restaurant, including but not limited to a McDonald's, Burger King, Wendy's or Roy Rogers, (iii) no free-standing restaurant, except for a free-standing non-drive-in restaurant which is being operated while a motel, hotel, inn or lodge is located and operating on the property herein conveyed, and (iv) no other use not permitted by any master plan adopted (whether now existing or hereafter adopted) and any amendments thereto by the City of Waynesboro shall be constructed or operated upon the property herein conveyed or any portion thereof. This restriction shall only apply for so long as any portion of the remaining property owned by the party of the first part is being used as a factory outlet and/or discount retail stores. Upon the discontinuance of such use this restriction shall expire."

By a recorded deed of trust, BMC conveyed its four-acre tract to Alexander F. Dillard, Jr., and Earl R. Johnson, trustees, to secure payment of an indebtedness to the Bank of Essex.

After Shenandoah Village conveyed the four-acre tract to BMC, the Federal Deposit Insurance Corporation (FDIC) exercised its rights to take control of Dollar Dry Dock Bank as receiver. Apparently, Dollar Dry Dock Bank acquired title to the property that Shenandoah Village Associates had conveyed to the Bank in trust and, by a recorded deed, that property was conveyed to the FDIC. Subsequently, the FDIC, as receiver for the Bank, conveyed

135.801 acres of the property to Waynesboro Village, without reference to the restrictive covenants in the 1989 recorded deed.

BMC is a Virginia partnership which owns, develops, and operates lodging facilities and has plans to develop its four-acre parcel as a motel with a restaurant as permitted by the restrictive covenants. BMC spent $350,000 to purchase the land and has spent at least $93,680 in fees to architects, attorneys, engineers, and surveyors for the planning and future construction of a motel. Additionally, BMC has incurred interest and debt service expense to secure loans to finance the acquisition of the property and construction of a motel on its property.

Waynesboro Village filed its bill of complaint against BMC, the Bank of Essex, and Alexander F. Dillard, Jr., trustee, and Earl R. Johnson, trustee, seeking a decree that the aforementioned restrictive covenants do not prohibit Waynesboro Village from using its property "for a motel, hotel, inn or lodging business or similar facility." The defendants filed numerous responsive pleadings and a cross-bill. Additionally, the defendants filed a motion for summary judgment, asserting that the restrictive covenants contained in the deed from Shenandoah Village Associates, predecessors in title to Waynesboro Village, L.L.C., and BMC Properties, are expressly intended to create a servitude and burden upon their respective properties so long as the proposed uses of the property are maintained and, thus, the covenants run with the title of the respective land as a matter of law and are enforceable. Because there were no material facts in dispute, the trial court

considered argument of counsel and certain exhibits, and entered a final decree which granted the defendants' motion for summary judgment and decreed that the covenants are enforceable. Waynesboro Village appeals.

Waynesboro Village argues that the trial court erred "either in its determination that the [restrictive covenants are] not ambiguous or in its determination that the correct interpretation of the [r]estriction is that it currently restricts [Waynesboro Village from] using its land for the development of a hotel, motel, or other lodging facility."  Continuing, Waynesboro Village says that the restriction which prohibits it from constructing a motel on its property is ambiguous because it may "be construed to take life at such time (if ever) as BMC actually develops its property for use as a lodging facility.  When or if that will occur is not clear from the record.  Hence, the [r]estriction, which does not now apply and may never apply by its own terms, yields an anomalous result."  Waynesboro Village says that this purported ambiguity renders the restriction unenforceable.[1]

We disagree with Waynesboro Village's contentions.  We follow the "plain meaning" rule when construing written instruments:

> "[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at

---

[1] Waynesboro Village withdrew its assignment of error that the trial court erred "in its determination that the [restriction] is not invalid because [Shenandoah Village Associates] did not possess the necessary capacity to convey an interest in what would become the [Waynesboro Village property]."

liberty to search for its meaning beyond the instrument
itself. . . .   This is so because the writing is the
repository of the final agreement of the parties."
Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796
(1983) (quoting Globe Co. v. Bank of Boston, 205 Va.
841, 848, 140 S.E.2d 629, 633 (1965)).

Capital Commercial Prop. v. Vina Enterprises, 250 Va. 290, 294–

95, 462 S.E.2d 74, 77 (1995); Management Enterprises v. The

Thorncroft Co., 243 Va. 469, 472, 416 S.E.2d 229, 231 (1992).  We

have stated that the word "ambiguity" is defined as "the

condition of admitting of two or more meanings, of being

understood in more than one way, or of referring to two or more

things at the same time."  Berry, 225 Va. at 207, 300 S.E.2d at

796 (quoting Webster's Third New International Dictionary 66 (3d

ed. 1976)).

Additionally, and just as important, we stated in Friedberg

v. Riverpoint Bldg. Comm., 218 Va. 659, 665, 239 S.E.2d 106, 110

(1977):

"Valid covenants restricting the free use of land,
although widely used, are not favored and must be
strictly construed and the burden is on the party
seeking to enforce them to demonstrate that they are
applicable to the acts of which he complains.  Riordan
v. Hale, 215 Va. 638, 641, 212 S.E.2d 65, 67 (1975);
Traylor v. Halloway, 206 Va. 257, 259, 142 S.E.2d 521,
522–23 (1965).  Substantial doubt or ambiguity is to be
resolved against the restrictions and in favor of the
free use of property.  Schwarzschild v. Welborne, 186
Va. 1052, 1058, 45 S.E.2d 152, 155 (1947).
But if it is apparent from a reading of the whole
instrument that the restrictions carry a certain
meaning by definite and necessary implication, then the
thing denied may be said to be clearly forbidden, as if
the language used had been in positive terms of express
inhibition.  Whitehurst v. Burgess, 130 Va. 572, 576–
77, 107 S.E. 630, 631–32 (1921)."

We hold that the restrictive covenants here are unambiguous.

It is apparent from a review of the restrictive covenants that

they have definite and necessary meanings.  The aforementioned reciprocal restrictive covenants were created to establish a general plan of development in which a lodging facility would be developed on the four-acre parcel purchased by BMC and factory outlets, discount retail stores, gas stations and fast food facilities would be developed only on the remaining parcel.

These recorded restrictions are covenants, at common law, which run with the land and are, therefore, enforceable.  As we recently stated:

> "At common law, a landowner may enforce a covenant running with the land provided he establishes:  (1) privity between original parties; (2) privity between original parties and their successors; (3) an intent that the restriction will run with the land; and (4) that the covenant 'touches and concerns' the land.  Additionally, the conveyance must be in writing."  Sloan v. Johnson, 254 Va. 271, 276, 491 S.E.2d. 725, 728 (1997) (citations omitted).

The record indicates that the defendants established each of these requirements.

Waynesboro Village contends that the trial court, "acting as a court of equity, erred in applying the [r]estriction to restrict [Waynesboro Village] from using its land for the development of a hotel, motel, or other lodging facility."  Essentially, Waynesboro Village argues that more than seven years have elapsed since the restrictions were placed in the 1989 deed, that BMC has taken no apparent action "to cause the [r]estriction to ripen into an enforceable provision" and that "the lapse of time, coupled with BMC's inaction, has resulted in a change in position by [Waynesboro Village], an innocent party acting in good faith without notice of the applicability of any current

restriction."

We find no merit in Waynesboro Village's contentions. When Waynesboro Village purchased the property from the FDIC, Waynesboro Village was charged with constructive knowledge of the restrictive covenants contained in the 1989 deed because the deed was in Waynesboro Village's chain of title and "once a deed is recorded, the admission to record is in law notice to the entire world." Porter v. Wilson, 244 Va. 366, 369, 421 S.E.2d 440, 442 (1992); Jones v. Folks, 149 Va. 140, 144, 140 S.E. 126, 127 (1927).

We also disagree with Waynesboro Village's contention that BMC is estopped "to ask a court of equity to interpret the [r]estriction so as to apply in the future to the detriment of [Waynesboro Village]." The doctrine of equitable estoppel simply has no application here.

> "To establish equitable estoppel, it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice, Security Co. v. Juliano, Inc., 203 Va. 827, 834, 127 S.E.2d 348, 352 (1962), or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped. Khoury v. Memorial Hospital, 203 Va. 236, 243, 123 S.E.2d 533, 538 (1962). Elements necessary to establish equitable estoppel, absent a showing of fraud and deception, are a representation, reliance, a change of position, and detriment." T... v. T..., 216 Va. 867, 872-73, 224 S.E.2d 148, 152 (1976).

Waynesboro Village does not contend that the defendants engaged in any fraudulent conduct or deception, and the record does not show that the defendants made any representations to Waynesboro Village.

Next, Waynesboro Village argues that the restrictive

covenant is unenforceable because of the D'Oench, Duhme doctrine.
We disagree.

The United States Supreme Court, in D'Oench, Duhme & Co. v.
FDIC, 315 U.S. 447, 457 (1942), created a rule designed to
implement a "federal policy to protect [the FDIC], and the public
funds which it administers, against misrepresentations as to the
securities or other assets in the portfolios of the banks which
[the FDIC] insures or to which it makes loans."  There, a
securities firm sold certain bonds to a bank, and payment upon
the bonds was later defaulted.  The firm executed a demand note,
payable to the bank, to cover the loss of the amount due on the
bonds.  The bank identified the note, instead of the past due
bonds, as an asset on the bank's financial books.  The firm and
the bank made a secret agreement that the proceeds of the bonds
would be credited to the note and that the note would never be
called for payment.  Subsequently, the bank failed, and the FDIC
acquired the note as part of the collateral securing a loan to
the bank.  The FDIC filed a suit to collect on the note, and the
firm claimed that the agreement with the bank relieved it of
liability.

The Supreme Court held that the defendant "was responsible
for the creation of the false status of the note in the hands of
the bank.  It therefore cannot be heard to assert that the
federal policy to protect [the FDIC] against such fraudulent
practices should not bar its defense to the note."  Id. at 461.
The Court also stated:
> "Plainly one who gives such a note to a bank with a
> secret agreement that it will not be enforced must be

presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners. . . .  The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect.  It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled."  Id. at 460.

Subsequently, Congress enacted 12 U.S.C. § 1823(e)(1) which, to some extent, codified the D'Oench, Duhme doctrine.[2]

Assuming, but not deciding, that Waynesboro Village, as a purchaser of real property from the FDIC, has standing to assert a defense that the restriction violates the D'Oench, Duhme doctrine and § 1823(e), we hold that neither the doctrine nor the federal statute is implicated here.  As the United States Court of Appeals for the Fifth Circuit stated, "[t]he modern D'Oench rule protects the FDIC, as receiver of a failed bank or as purchaser of its assets, from a borrower who has "'lent himself

_____

[2] The Federal Deposit Insurance Act of 1950, 12 U.S.C. § 1823(e)(1) provides:

"No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement --
          (A) is in writing,
          (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
          (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
          (D) has been, continuously, from the time of its execution, an official record of the depository institution."

to a scheme or arrangement' whereby banking authorities are likely to be misled."  Beighley v. Federal Deposit Ins. Corp., 868 F.2d 776, 784 (5th Cir. 1989) (quoting D'Oench).  In particular, D'Oench bars the use of unrecorded agreements between the borrower and the bank as the basis for defenses or claims against the FDIC."  Bowen v. Federal Deposit Ins. Corp., 915 F.2d 1013, 1015-16 (1990).

The undisputed facts in the record reveal that the restrictive covenants contained in the 1989 deed of trust, which were recorded among the land records in Waynesboro County, simply did not mislead the FDIC, the failed bank (Dollar Dry Dock Bank), or Waynesboro Village.

Accordingly, we will affirm the judgment of the trial court.

Affirmed.